**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

_____

IN RE:
ANGELO DIVITTORIO,                                          Chapter 13
            DEBTOR.                            Case No. 05-20854-WCH

_____

ANGELO DIVITTORIO,
            PLAINTIFF,

                                   Adversary Proceeding
v.                                                          No. 09-1089

HSBC BANK, USA, N.A., AS TRUSTEE ON
BEHALF OF ACE SECURITIES CORP. HOME
EQUITY LOAN TRUST AND FOR THE
REGISTERED HOLDERS OF ACE SECURITIES
CORP. HOME EQUITY LOAN TRUST, SERIES
2006-SD1, ASSET BACKED PASS-THROUGH
CERTIFICATES, OCWEN LOAN SERVICING,
LLC, AND INDYMAC FEDERAL BANK,
            DEFENDANTS.

_____

**MEMORANDUM OF DECISION**

**I. INTRODUCTION**

The matters before the Court are the consolidated Motion to Dismiss (the "Motion to

Dismiss") on remand from the United States District Court for the District of Massachusetts (the

"District Court") and the Motion for Summary Judgment, both filed by the Defendant HSBC Bank,

USA, N.A.[1] (the "Defendant"), as well as the oppositions thereto filed by the Plaintiff-Debtor Angelo

_____

[1] As Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust and for
registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2006-SD1, Asset
Backed Pass-Through Certificates.

1

DiVittorio (the "Debtor"). On July 23, 2009, I granted the Motion to Dismiss and dismissed the Debtor's claims against the Defendant for alleged violations of the Massachusetts Consumer Credit Cost Disclosure Act ("CCCDA"),[2] the Massachusetts analog to the federal Truth in Lending Act ("TILA"),[3] for failure to state a claim upon which relief could be granted.[4] On appeal, the District Court concluded that I failed to consider whether the Defendant complied with a portion of the Official Staff Commentary to TILA's enabling regulations (the "Commentary") in calculating the Annual Percentage Rate (the "APR") disclosed to the Debtor on the Truth in Lending Disclosure Statement (the "TIL Disclosure") in connection with a refinance of the Debtor's home and remanded the matter for reconsideration.[5] On remand, the Defendant filed the Motion for Summary Judgment asserting that the Debtor was judicially estopped from raising or had otherwise waived his claims for alleged violations of the CCCDA. For the reasons set forth below, I will reaffirm my order dismissing the Debtor's complaint for failure to state a claim upon which relief could be granted and, alternatively, grant the Motion for Summary Judgment.[6]

---

[2] Mass. Gen. Laws ch. 140D, § 1 *et seq*.

[3] 15 U.S.C. § 1601 *et seq*.

[4] *DiVittorio v. HSBC Bank USA, N.A. (In re DiVittorio)*, No. 09-1089, 2009 WL 2246138 (Bankr. D. Mass. Jul. 23, 2010).

[5] *DiVittorio v. HSBC Bank USA, N.A. (In re DiVittorio)*, 423 B.R. 391 (D. Mass. 2010).

[6] Although affirming my prior decision to dismiss the Debtor's claims on remand necessarily renders the Motion for Summary Judgment moot, given the likelihood of further appellate review, consideration of the Motion for Summary Judgment on the merits appropriately serves the interests of judicial economy.

## II. __BACKGROUND__[7]

The facts of this case are largely not in dispute.[8]   The Debtor and his brother, Joseph

DiVittorio (collectively, the "DiVittorios"), have resided at  39-41 Bonner Avenue, Medford,

Massachusetts (the "Property") since 1970.[9]   After inheriting it from their parents, the DiVittorios

refinanced the Property thirteen times between 1998 and 2003.[10]   On March 13, 2003, the Debtor

closed the present loan transaction in the original amount of $330,000 by executing a note (the

"Note") and granting a first mortgage to IndyMac Bank, FSB, ("IndyMac") (the "Mortgage").[11]

Joseph DiVittorio, a co-owner of the property, is a signatory of the Mortgage, but is not an obligor

on the Note.[12]   The obligation under the Note and Mortgage was incurred primarily for personal,

family, or household purposes.[13]   Although the IndyMac loan was an "income-stated loan," the

---

[7] I take judicial notice of the docket in the present adversary proceeding, as well as that of the main case pending before this Court. *See Rodi v. Southern New England School of Law*, 389 F.3d 5, 17-19 (1st Cir. 2004) (citations omitted).

[8] For purposes of the Motion to Dismiss, I must accept as true all allegations contained within the Debtor's Complaint.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nonetheless, I note that upon filing the Motion for Summary Judgment, the Defendant did not challenge the factual allegations contained in the Debtor's Complaint despite the opportunity. Moreover, I note that aside from a few irrelevant characterizations, the Debtor does not dispute the facts set forth in the Defendant's Statement of Undisputed Material Facts.  *See* [The Defendant's] Statement of Undisputed Material Facts (the "Statement of Facts"), Docket No. 73; Angelo DiVittorio's Response to HSBC's Statement of Undisputed Material Facts and Statement of Additional Undisputed Facts ("Statement of Additional Facts"), Docket No. 80.

[9] Complaint, Docket No. 1 at ¶¶ 3-4.

[10] *Id.* at ¶ 10.

[11] *Id.* at ¶¶ 5, 8, 10.

[12] Statement of Additional Facts, Docket No. 80 at ¶19.

[13] Complaint, Docket No. 1 at ¶ 6.

3

Debtor contends that prior to the closing, IndyMac obtained the Debtor's credit report and information regarding the timeliness of his payments under his prior mortgages.[14]  The Defendant purports to be the current holder of the Mortgage.[15]

As previously stated, the closing took place on March 13, 2003, at which time the Debtor received multiple disclosures regarding the Note and Mortgage, including the TIL Disclosure, a three page document titled "Adjustable Rate Mortgage Loan Program Disclosure Non-Convertible 2/6 LIBOR Performance ARM" (the "ARM Disclosure"), the Addendum to Fixed/Adjustable Rate Note (the "Addendum") and the Rider to Security Instrument and Fixed/Adjustable Rate Rider (the "Adjustable Rate Rider").[16]  I note that the form of the TIL Disclosure is substantially similar to the model form provided in the appendix to Regulation Z,[17] TILA's enabling regulations promulgated by the Federal Reserve Board.[18]  The TIL Disclosure indicated, *inter alia*, an APR of 7.365%.[19]

The TIL Disclosure further reflected that the loan contained a "variable rate feature" and referred the Debtor to a separate disclosure regarding the variable rate.[20]  The ARM Disclosure, which appears to be a generic disclosure form for this type of loan product, explained that the interest

---

[14] *Id.* at ¶ 11.

[15] *Id* at ¶ 5.

[16] *Id.* at ¶ 12, 15; *see* Complaint, Docket No. 1 at Exs. A, B; Motion filed by Creditor Ocwen Loan Servicing, LLC for Relief from Stay Re: 39-41 Bonner Avenue, Medford, MA 02155 ("MRS"), Docket No. 157, Case No. 05-20854-WCH, at Ex. A p5, Ex. B p17.

[17] 12 C.F.R. § 226.1 *et seq.*

[18] 12 C.F.R. Pt. 226, App. H; *see also* 209 C.M.R. 32.28(5) (incorporating appendix H of Regulation Z by reference).

[19] Complaint, Docket No. 1 at Ex. A.

[20] *Id.* at ¶ 15.

4

rate on the Note would be determined as follows:

> Your Interest Rate will be based on an index rate plus a margin, rounded to the nearest .125% (the "Interest Rate"), unless your Caps limit the amount of change in the Interest Rate. The "Margin" is the amount which will be added to the index to determine your Interest Rate. *The Margin may be reduced by .50% for credit levels I+, I, and II as shown in the examples below; and, by 1.00% for credit levels III and IV after the second year of the loan if all payments for the first two years of the loan are paid on time.* If the Margin is reduced after the second year of the loan, the Margin will not change through the remaining term of the loan. Please ask us for our current Interest Rates and Margins.[21]

As emphasized above, the interest rate was subject to a performance based rate reduction feature (the "Reduction Feature") by which the Debtor would qualify for a reduced margin if he made the first two years of payments timely. While the ARM Disclosure did not indicate the Debtor's "credit level" or the potential margin reduction he would receive pursuant to the Reduction Feature,[22] both the Addendum and the Adjustable Rate Rider clarified that the Debtor was entitled to a .500% margin reduction if he made the first twenty-two payments timely.[23]

According to the Complaint, IndyMac utilized the reduced interest rate the Debtor would have been entitled to under the Reduction Feature, thereby assuming he would make the first twenty-two payments timely, to compute the APR on the TIL Disclosure.[24] The TIL Disclosure, however, did not reflect this assumption on its face as the basis for its APR calculation.[25] Nonetheless, failure to make the first twenty-two payments timely would result in an additional interest payment of

---

[21] *Id.* at Ex. B (emphasis added).

[22] *Id.* at ¶ 17.

[23] MRS, Docket No. 157, Case No. 05-20854-WCH at Ex. A p5, Ex. B p17.

[24] Complaint, Docket No. 1 at ¶ 18.

[25] *Id.* at ¶ 19.

5

approximately $100 per month for twenty-eight years and over $30,000 in additional finance charges.[26]

The Debtor filed his Chapter 13 petition on October 11, 2005.[27]  Since that time, the Note and Mortgage have been the subject of a great deal of litigation between the Debtor and the Defendant's servicer, Ocwen Loan Servicing, LLC ("Ocwen").[28]  Ocwen first moved for relief from stay to foreclose the Property on August 10, 2006.[29]  The Debtor opposed the motion, and after two months of negotiations, the parties filed a stipulation on October 25, 2006 whereby the Debtor would cure a post-petition arrearage.[30]  On March 22, 2007, Ocwen filed an affidavit of non-compliance asserting that the Debtor had defaulted on the terms of the stipulation.[31]  The Debtor again opposed, and after eight continuances of the hearing on Ocwen's affidavit of non-compliance, the Debtor filed an Assented to Motion of Debtor for Authority to Modify Loan with Ocwen Loan Servicing, LLC on November 30, 2007.[32]

Pursuant to the Modification Agreement (the "Modification"), the interest rate on the loan was reduced from in excess of 11% to 7% fixed, and the arrearage was amortized over the remaining

---

[26] *Id.* at ¶ 22.

[27] Statement of Facts, Docket No. 73 at ¶ 4.

[28] *Id.* at ¶¶ 3, 8.

[29] *Id.* at ¶ 7; *See* Docket No. 69, Case No. 05-20854-WCH.

[30] Statement of Facts, Docket No. 73 at ¶ 7; *See* Docket Nos. 70, 91, Case No. 05-20854-WCH.

[31] Statement of Facts, Docket No. 73 at ¶¶ 7-8.

[32] Statement of Facts, Docket No. 73 at ¶ 8.  *See* Docket Nos.96, 128, Case No. 05-20854-WCH.

life of the loan.[33]  The Modification also contained the following release (the "Release") given by

the Debtor:

> YOUR RELEASE OF OCWEN: IN THE EVENT THAT YOU HAVE ANY
> CLAIMS, ACTIONS OR CAUSES OF ACTION, STATUTE OF LIMITATIONS
> OR OTHER DEFENSES, COUNTERCLAIMS OR SETOFFS OF ANY KIND
> WHICH EXIST AS OF THE DATE OF THIS MODIFICATION, WHETHER
> KNOWN OR UNKNOWN TO YOU, WHICH YOU NOW OR HEREAFTER MAY
> ASSERT AGAINST OCWEN IN CONNECTION WITH THE MAKING,
> CLOSING, ADMINISTRATION, COLLECTION OR THE ENFORCEMENT BY
> OCWEN OF THE LOAN DOCUMENTS, THIS MODIFICATION OR ANY
> OTHER RELATED AGREEMENTS, THEN BY EXECUTING THIS
> MODIFICATION YOU FOREVER IRREVOCABLY WAIVE AND RELINQUISH
> THEM. FOR PURPOSES OF THIS SECTION, OCWEN SHALL SPECIFICALLY,
> [sic] INCLUDE BUT SHALL NOT BE LIMITED TO, PRESENT AND FORMER
> OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, SERVICING AGENTS,
> ATTORNEYS AND ALL PRIOR AND SUBSEQUENT PARTIES OR
> PREDECESSOR(S) IN INTEREST, TO BOTH OCWEN AND THE INVESTOR.[34]

The Modification expressly defined both Ocwen and "Investor" to include HSBC Bank.[35]  While

both the Debtor and his former counsel signed the Modification, HSBC Bank did not sign the copy

submitted to the Court.[36]  I approved the Modification on December 11, 2007.[37]

Despite the Modification, the Debtor once again fell behind on his post-petition mortgage

payments and Ocwen moved for relief from stay for the second time on October 10, 2008.[38]  After

---

[33] Statement of Facts, Docket No. 73 at ¶ 10, Ex. A.

[34] Statement of Facts, Docket No. 73 at ¶ 11, Ex. A.

[35] Statement of Facts, Docket No. 73 at ¶10, Ex A, ¶¶ A, D.

[36] Statement of Additional Facts, Docket No. 80 at ¶ 20.

[37] *See* Docket No. 137, Case No. 05-20854-WCH.

[38] Statement of Facts, Docket No. 73 at ¶ 13.

several extensions, the Debtor filed an opposition on February 3, 2009.[39]  On February 5, 2009, at

the suggestion of Debtor's counsel, I granted Ocwen's motion for relief effective March 27, 2009.[40]

Shortly thereafter, by a letter dated February 11, 2009 addressed to the Defendant, Ocwen,

and IndyMac, the Debtor purported to rescind the loan and requested an accounting, almost six years

after the closing of the refinancing.[41]  The Defendant disputed the validity of the Debtor's exercise

of rescission.[42]  On February 13, 2009, the Debtor, through new counsel, filed a motion seeking to

vacate my order granting relief from stay (the "Motion to Alter Order") on the basis that the Debtor

rescinded the loan.[43]  Ocwen filed an opposition, and on March 10, 2009, the Debtor filed the above-

captioned adversary proceeding asserting novel theories in support of his claim of rescission under

the CCCDA.[44]  Although the statute of limitations had already expired under the CCCDA,[45] the

Debtor permissibly advanced right of rescission defensively by way of recoupment.[46]

On March 12, 2009, I held a hearing on the Motion to Alter Order.  After hearing from both

---

[39] *See* Docket Nos. 159, 162, 166, 190, Case No. 05-20854-WCH.

[40] Statement of Facts, Docket No. 73 at ¶ 14.  At the hearing, Debtor's counsel offered no defense to Ocwen's motion for relief from stay, but suggested that relief enter in thirty days to afford the Debtor an opportunity to pursue a loan modification with the lender.

[41] *Id.* at ¶ 34.

[42] *Id.* at ¶ 35.

[43] Complaint, Docket No. 1 at ¶ 34.

[44] Both Ocwen and the Federal Deposit Insurance Corporation, as receiver for IndyMac Bank, FSB, were dismissed from this adversary proceeding with the assent of the Debtor prior to this matter being taken under advisement.

[45] *See* Mass. Gen. Laws ch. 140D, § 10.

[46] *In re DiVittorio*, 2009 WL 2246138 *9.

parties, I declined to vacate my order, but stayed the foreclosure ninety days to determine the validity

of the Debtor's purported rescission through the adversary proceeding on the condition that he pay

the mortgagee $2,000 per month on the first day of each month as adequate protection.   The

Defendant moved to dismiss the adversary proceeding on April 28, 2009, and the Debtor filed an

opposition on May 21, 2009.   On May 28, 2009, I conducted a hearing on the Motion to Dismiss,

and at its conclusion, took the matter under advisement.

Through his Complaint, the Debtor asserted, *inter alia*, that the APR stated on the TIL

Disclosure was numerically inaccurate because it was impermissibly calculated using the Reduction

Feature, or, in the alternative, the method of calculation, namely, the Reduction Feature, was not

clearly and conspicuously disclosed.[47]   Essentially, the Debtor contended that because he had not yet

made twenty-two timely payments on the date of consummation, he was not entitled to a margin

reduction under the Reduction Feature, rendering the APR inaccurate.   In support, the Debtor relied

on the following passage of the Commentary for the proposition that the APR must be calculated

using conditions as they exist at consummation:

> When creditors use an initial interest rate that is not calculated using the index or
> formula for later rate adjustments, the disclosures should reflect a composite annual
> percentage rate based on the initial rate for as long as it is charged and, *for the
> remainder of the term, the rate that would have been applied using the index or
> formula at the time of consummation*. . . .[48]

Alternatively, the Debtor argued that the APR was not clearly and conspicuously disclosed because

---

[47] Though not relevant here, the Debtor also contended that the existence of an initial
premium rate was not clearly and conspicuously disclosed and that the failure to specify a
payment period in the repayment schedule provided on the TIL Disclosure constituted a material
non-disclosure under the CCCDA.   As the District Court's remand order did not address my
rejection of these theories, I need not reconsider them.

[48] 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. 226.17(c)(1)(10)(I) (emphasis added).

the TIL Disclosure failed to reflect the assumption of timely payments. Moreover, the Debtor

alleged in the Complaint that "[t]he lender . . . knew or should have known that such an assumption

was not justified for the type of loan it was making. Upon information and belief, statistical data

within the lender's possession demonstrated this."[49]

On July 23, 2009, I issued a Memorandum of Decision (the "Decision") and separate order

granting the Motion to Dismiss on all counts. Turning first to the alleged numerical inaccuracy of

the APR, I noted that neither the CCCDA nor its regulations provided any "meaningful guidance on

how one might factor in an assumption like the one now before me."[50] I rejected the applicability

of the Commentary relied on by the Debtor because I erroneously found that it post-dated the time

of consummation and, even if it had, it was nothing more than a safe harbor and not a *per se* rule.[51]

Based upon the lack of clear instruction in the Commentary, I concluded that if the APR's

incorporation of the Reduction Feature violated the CCCDA, it was "more likely a matter of

disclosure than computation."[52]

In considering whether the APR was clearly and conspicuously disclosed, I found that it was

"not unreasonable for a lender to assume that a borrower will make timely payments . . . . [because]

[t]hat is no more than what the borrower agrees to do when he signs a note and mortgage."[53] With

that in mind, I concluded that the APR was clearly and conspicuously disclosed because, reasonably

---

[49] Complaint, Docket No. 1 at ¶ 20.

[50] *In re DiVittorio*, 2009 WL 2246138 *9.

[51] *Id.* (*citing* 209 C.M.R § 32.27).

[52] *Id.*

[53] *Id.* at *10.

assuming timely payments, the APR was calculated in a manner consistent with the Reduction Feature formula set forth in the Addendum, Adjustable Rate Rider, and ARM Disclosure.[54]  The Debtor subsequently appealed.

On January 21, 2010, the District Court entered a Memorandum and Order in which it held that I erred in rejecting the Commentary for two reasons (the "Remand Order").[55]  First, the District Court noted that despite my assertion to the contrary, the relevant passage of the Commentary existed at the time of consummation.[56]  Second, the District Court explained that the Supreme Court of the United States "has instructed that, '[u]nless demonstrably irrational,' provisions of the Commentary are dispositive statements of what the TILA and its regulations require."[57]  In light of these rulings, the District Court remanded the Motion to Dismiss for reconsideration.[58]

On remand, I conducted a status conference at the parties' request on January 28, 2010.  At the status conference, the Debtor suggested that the parties' appellate briefs might be submitted in lieu of further briefing, and HSBC Bank asked for an opportunity to file a motion for summary judgment to be consolidated with the Motion to Dismiss.  I granted both requests, and the Motion for Summary Judgment was filed on March 5, 2010.[59]  The Debtor subsequently filed an opposition

---

[54] *Id.* at *11.

[55] *In re DiVittorio*, 423 B.R. at 391.

[56] *Id.* at 393.

[57] *Id.* (*citing Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980)).

[58] *Id.*

[59] The Debtor did not oppose the Defendant's request to consolidate the Motion to Dismiss with the Motion for Summary Judgment at the January 28, 2010 hearing or in his opposition.

on April 5, 2010, asserting, *inter alia*, that Joseph DiVittorio, the Debtor's brother, had since

exercised his own right to rescind the transaction as a co-owner of the Property.[60]

On April 8, 2010, I held a hearing on the consolidated Motions to Dismiss and for Summary

Judgment and, after extensive oral argument by both parties, took the matter under advisement.

## III. <u>POSITIONS OF THE PARTIES</u>

<u>The Defendant</u>

With respect to the Motion to Dismiss, the Defendant characterizes the Debtor's theories

regarding the APR disclosure as an "illogical twisting of the statute" because all TIL disclosures

assume timely payments as it "would be difficult to imagine how an originating lender could make

any coherent disclosure if it had to build in the possibility and timing of a borrower defaulting."[61]

On remand, the Defendant argues that the Commentary cited by the Debtor and the District Court

is merely a red herring, and that the Decision should stand on my related findings, namely, that the

assumption of timely payments and receipt of the margin reduction was reasonable, rendering the

TIL Disclosure accurate.  In support, the Defendant notes that the Commentary is devoid of any

language which would preclude such an assumption.  Because the parties agree that the Defendant

calculated the APR based on a composite rate as required by the Commentary, the Defendant

construes the Debtor's argument as asserting that the lender did not use the best available

information at the time as required by the regulations.  In response, the Defendant asserts that the

disclosure provided was appropriately based on the Debtor's contractual obligations as they existed

at consummation and rejects the premise that only events that have already occurred can be factored

---

[60] Statement of Additional Facts, Docket No. 80 at ¶ 19.

[61] HSBC Bank's Memorandum in Support of Motion to Dismiss, Docket No. 15 at p.6.

into the APR calculation.

The Defendant further contends that the Debtor's allegation that the lender "knew or should have known that such an assumption [of timely payments] was not justified," is a baseless legal conclusion not properly considered.  In a footnote in its brief to the District Court, the Defendant suggests that this is an artificial CCCDA claim premised on other claims regarding the origination of the loan which are now time-barred.  In any event, the Defendant disputes the idea that such a default was as certain as the Debtor suggests.  If it was, the Defendant posits, then the lender would not have made the loan.

Through the Motion for Summary Judgment, the Defendant asserts two additional reasons why the Debtor's claims should fail as a matter of law.  First, the Defendant argues that the Debtor should be judicially estopped from asserting any loan origination claims against the Defendant because he failed to disclose those claims in his bankruptcy case.  The Defendant contends that I accepted the Debtor's repeated "certification" in his schedules and Statement of Financial Affairs that he held no claims against the Defendant and that the Debtor affirmed the validity and enforceability of the Mortgage through confirmation of his Chapter 13 plan.  Moreover, based upon the Debtor's certification, the Defendant asserts that it negotiated and ultimately entered into a stipulation and the Modification.  By entering into those agreements, the Defendant contends that the Debtor took the position that the Mortgage was valid and not subject to rescission, a position which is directly at odds with this adversary proceeding.  As such, the Defendant would be unfairly prejudiced if the Debtor was permitted to advance his claims in the Complaint.

Second, the Defendant asserts that, by virtue of the Release granted by the Debtor within the Modification in which the Defendant is encompassed by the definitions of both "Ocwen" and

13

"Investor," the Debtor waived his claims against it. While conceding the Release does not specifically use the words TILA or the CCCDA, the Defendant notes a clear reference to claims "in connection with the making, closing, administration, collection, or the enforcement . . . of the loan documents."[62] The Defendant contends that the Release constitutes a knowing and well informed decision on the part of the Debtor as it was executed by him as part of the Modification, which itself was the result of lengthy negotiations during which the Debtor was represented by counsel. Moreover, the Defendant argues that the Modification need only be signed by the Debtor to be enforceable against him.

The Defendant notes that there are few reported cases with respect to TILA waivers, but argues that the most recent, *Tucker v. Beneficial Mortgage Co.*,[63] held that a plaintiff can effectively release his TILA rescission claims when he signs a knowing release and there is no disparate bargaining power, proving there is no absolute prohibition. The Defendant suggests that *Mills v. Home Equity Group, Inc.*[64] and *Parker v. Dekalb Chrysler Plymouth*,[65] two cases where courts refused to honor TILA claim releases, are inapposite, outdated, and expressly rejected by *Tucker*. Both are distinguishable, the Defendant asserts, because the rescission period in those cases had not expired as a matter of law at the time the consumers signed the releases. Here, in contrast, the Debtor received the benefit of the full four year extended right of rescission and only now asserts it defensively through recoupment. Moreover, the Defendant argues that the Debtor, unlike the

---

[62] Statement of Facts, Docket No. 73 at ¶ 11, Ex. A.

[63] *Tucker v. Beneficial Mortgage Co.*, 437 F.Supp.2d 584 (E.D. Va. 2006).

[64] *Mills v. Home Equity Group, Inc*, 871 F.Supp. 1482 (D.D.C. 1994).

[65] *Parker v. Dekalb Chrysler Plymouth*, 673 F.2d 1178, 1182 (11th Cir. 1982).

14

consumer in *Parker*, was represented by counsel at the time he executed the release.

To the extent that the Debtor argues that the Release does not comply with the regulation regarding waiver of a consumer's right to rescind,[66] the Defendant counters that by its express provisions, that section only applies to the initial three day right to rescind and not any extended right that may arise under the statute or regulations.   The Defendant notes that the purpose of the regulation is to allow consumers to waive the right to rescind to meet "bona fide personal financial emergenc[ies]."[67]   Such an event, the Defendant posits, could only occur at the outset of the loan transaction and is thus inapplicable to post-funding waivers.

In support of both the judicial estoppel and waiver arguments, the Defendant relies on *Petroski v. First Horizon Homes Loans, Inc.*[68] for the proposition that a discovery rule should apply to the present case.   Because the Debtor had access to all the loan documents and was represented by counsel throughout his bankruptcy case, the Defendant reasons that even if the Debtor was not actually aware of his purported CCCDA claims, he could have discovered them at an earlier date.[69] With respect to judicial estoppel, the Defendant also contends that intent to conceal is not an element, but nonetheless suggests that if it were, delaying an inevitable foreclosure would suffice.

Finally, with respect to the Debtor's allegation that Joseph DiVittorio has now exercised his own right of rescission rendering both the judicial estoppel and waiver arguments moot, the

---

[66] *See* 209 C.M.R. § 32.23(5).

[67] *Id.*

[68] *Petroski v. First Horizon Home Loans, Inc.*, No. Civ.A.02-8022, 2004 WL 1551736 (E.D. Pa. Jul. 9, 2004).

[69] *See Salois v. The Dime Savings Bank of New York, FSB*, 128 F.3d 20, 25 (1st Cir. 1997).

Defendant asserts that it is irrelevant because Joseph DiVittorio does not have a claim pending against the Defendant here or in any court.  Additionally, while the Defendant concedes that the regulations provide that a co-owner has a separate right of rescission, it argues that the regulation cannot expand statutory rights where the statute only references the obligor.

The Debtor

On remand, the Debtor continues his opposition to the Motion to Dismiss by challenging the numerical accuracy of the APR as stated on the TIL Disclosure.[70]  First, the Debtor contends that I erred as a matter of law by not accepting as true his allegation in the Complaint that the lender "knew or should have known that such an assumption [of timely payments] was not justified."  The Debtor argues that the statement is a factual allegation and not a bare legal conclusion.  As a factual allegation, the Debtor asserts that I was required to accept it as true and erred by not only rejecting it, but assuming the opposite to be true, namely, the assumption of timely payments is reasonable.

In light of this allegation and the Commentary which states that the APR should be calculated based on conditions that existed at the time of consummation, the Debtor argues that the Defendant did not use the best information available.  Concluding that the Defendant "knew or should have known" that sub-prime borrowers would be delinquent in their payments, the Debtor asserts that the Reduction Feature amounted to an unlikely contingency that artificially depressed the APR on the TIL Disclosure.  In this way, the Reduction Feature was "untethered" to the circumstances as they existed at the time of consummation and was not the best information available.

In further support of his argument, the Debtor characterizes the Reduction Feature as an

---

[70] The Debtor also challenges my findings with respect to his other theories, but as previously stated, those issues are not effected by the District Court's Remand Order and I see no reason to reconsider them.

insidiously designed loan product that provides for a precisely defined numerical and temporal alteration of the rate structure based upon a contingency, which he argues, was unlikely to occur. In this way, the Reduction Feature is different from a late charge because, at the time of consummation, its impact is known and measurable. Accordingly, the Debtor asserts that the Defendant must suffer the consequences of its improbable prediction, implicitly arguing that the relative deceptiveness of the disclosure is based upon its ultimate impact. To hold otherwise, suggests the Debtor, would encourage lenders to creatively hide finance charges such that materially different loan products would have identical APRs, precluding informed comparison and teasing borrowers into disadvantageous loans.

While the Debtor concedes that, "in a technical sense," he was legally obligated to make every payment on time, he argues that at the time of consummation, the Defendant's obligation to apply the Reduction Feature was only contingent. Because the Defendant did not have a legal obligation to utilize the more favorable rate, the Debtor asserts it should be barred from using "an improbable assumption that the contingency will be met" to prevent misleading and inaccurate disclosures.

The Debtor also opposes the Motion for Summary Judgment on three grounds. First, with respect to judicial estoppel, the Debtor contends that failure to schedule an asset does not automatically result in the application of the judicial estoppel doctrine.[71] The Debtor further argues that judicial estoppel is not applied where the party's prior position was based on inadvertence or mistake. As such, the Debtor asserts that application of a discovery rule would be inappropriate as

---

[71] *See GE HFS Holdings, Inc. v. Nat'l Union Fire Ins. Co. Of Pittsburgh, PA*, 520 F.Supp.2d 213, 223 (D. Mass. 2007).

inadvertence only exists "when a party either lacks knowledge of the undisclosed claim or has no motive for their concealment."[72]   Moreover, the Debtor argues that the case law in this circuit requires a debtor to have been "playing fast and loose" in his failure to disclose an asset for judicial estoppel to apply.[73]   In contrast, the Debtor contends that his non-disclosure was innocent and a result of the Defendant's initial concealment of its calculation method.   In light of the Defendant's repeated characterization of the Debtor's claims as "novel," the Debtor asserts that it was reasonable for the claims not to be discovered until a second attorney reviewed the loan documents.

Second, the Debtor argues that the Release is ineffective because it ignores both the statute and regulations.   Relying on *Parker*, *Mills*, and a third case, *Johnson v. Steven Sims Subaru, Inc.*,[74] he contends that there is a special interest in guarding statutory remedies and courts must distinguish "pre-dispute" waivers from "post-dispute" waivers.   The Debtor argues that the regulations provide the only "pre-dispute" means of waiving the right to rescission.[75]   In support, he notes that the court in *Parker* refused to give effect to a release of a "prospective TILA claim" where the plaintiff was unaware of any such claim and lacked an appreciation of what rights she was waiving.[76]   Similarly, in *Mills*, the court refused to give effect to a release which expressly included reference to Regulation

---

[72] *Id.* at 224 (*quoting Barger v. City of Cartersville, Georgia*, 348 F.3d 1289, 1295 (11th Cir. 2003)).

[73] *See Payless Wholesale Distribs., Inc. v. Alberto Culver, Inc.*, 989 F.2d 570, 571 (1st Cir. 1993).

[74] *Johnson v. Steven Sims Subaru, Inc.*, No. 92 C 6355, 1993 WL 761231 (N.D. Ill. June 9, 1993).

[75] *See* 209 C.M.R. § 32.23(5).

[76] *Parker v. Dekalb Chrysler Plymouth*, 673 F.2d at 1182.

Z absent the narrowly drawn circumstances contemplated by the statute.[77] Citing *Johnson*, the Debtor argues that even "post dispute," TILA requires a specific waiver.[78]

Although somewhat vague, the Debtor's definition of "post-dispute" in this context appears to be one in which the consumer is actually aware of the right to rescind and has previously raised the TILA/CCCDA claim to the lender in some way. Moreover, he contends that his representation by legal counsel at the time of the Release was insignificant because he still did not know he had a claim under the CCCDA and cites the Defendant's non-disclosure of the "true" APR. Nonetheless, at oral argument the Debtor suggested that even if he knew of the non-disclosure, he could still pursue the claim as a "private attorney general."[79]

Because he was unaware of the existence of the claim at the time the Modification was executed, the Debtor argues that there was no dispute and that the "pre-dispute" rules apply. Applying those rules, namely, 209 C.M.R. § 32.23(5), the Debtor asserts the Release was ineffective because the regulation requires the Debtor to provide a written statement describing a *bona fide* personal financial emergency, specifically waiving the right to rescind, and signed by all consumers with a right to rescind.[80]

Alternatively, the Debtor argues that the Release was ineffective under the Statute of Frauds because it must be signed by the party to be charged, who in this case, he contends, is the

---

[77] *Mills v. Home Equity Group, Inc*, 871 F.Supp. at 1486.

[78] *Johnson v. Steven Sims Subaru, Inc.*, 1993 WL 761231 *4.

[79] Trans. April 8, 2010 at 21, ¶¶ 1-5.

[80] *See* 209 C.M.R. § 32.23(5).

19

Defendant.[81]  Furthermore, the Debtor asserts that the express language of the Release does not cover

the Defendant because use of both "Ocwen" and "Investor" in the Release, which were both

"misleadingly" defined to include the Defendant earlier in the Modification, suggests Ocwen has two

different meanings in the provision.  As such, the Debtor argues that I should not give effect to such

broad language.

Finally, the Debtor argues that both the Defendant's arguments for judicial estoppel and

waiver are moot in light of Joseph DiVittorio's exercise of his separate right of rescission.   In

support, the Debtor notes that the regulations expressly state that "each consumer whose ownership

is or will be subject to the security interest shall have the right to rescind the transaction . . . ."[82]

## IV. DISCUSSION

### A.  TILA and the CCCDA

To appropriately set the stage, a few words about TILA and the CCCDA would be helpful.

"Both TILA and CCCDA were enacted 'to assure a meaningful disclosure of credit terms so that the

consumer will be able to compare more readily the various credit terms available to him and avoid

the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing

and credit card practices.'"[83]  Additionally, "[b]oth acts provide that a borrower whose loan is secured

by his principal dwelling and who has been denied the requisite disclosures may rescind the loan

---

[81] Mass. Gen. Laws ch. 259, § 1.

[82] 209 C.M.R. § 32.23(1)(a).

[83] *Fidler v. Cent. Coop. Bank (In re Fidler)*, 226 B.R. 734, 736 (Bankr. D. Mass. 1998) (*quoting Beach v. Ocwen Federal Bank*, 523 U.S. 410, 412 (1998)).

transaction."[84]  For this reason, the CCCDA is sometimes referred to as the Massachusetts Truth in

Lending Act.[85]   In Massachusetts, however, credit transaction subject to the CCCDA are exempt

from many of the provisions of TILA.[86]  Nevertheless, because the provisions of the two statutes are

substantially the same, TILA remains relevant to this inquiry and federal court decisions with respect

to TILA are instructive in construing the parallel provisions of the CCCDA.[87]

From the outset, it is important to remember that the CCCDA, like TILA, is a disclosure

statute and does not "substantively regulate consumer credit."[88]   To that end, the Supreme Court of

the United States has observed that "[m]eaningful disclosure does not mean more disclosure.  Rather,

it describes a balance between competing considerations of complete disclosure . . . and the need to

---

[84] *Id.  See* 15 U.S.C. § 1635; Mass. Gen. Laws ch. 140D, § 10.

[85] *Jaaskelainen v. Wells Fargo Bank, N.A. (In re Jaaskelainen)*, 391 B.R. 627, 636 (Bankr. D. Mass. 2008), *aff'd in part, vacated in part, Wells Fargo Bank, N.A. v. Jaaskelainen*, 407 B.R. 449 (D. Mass. 2009) (finding the bankruptcy court has authority to condition rescission on the debtors' ability to tender).

[86] The Federal Reserve Board has exempted credit transactions within Massachusetts subject to the CCCDA from chapters two and four of TILA. 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. § 226.29(a) ¶ 4; *see Laudani v. Tribeca Lending Corp. (In re Laudani)*, 401 B.R. 9, 25 n.13 (Bankr. D. Mass. 2009).  Chapter two of TILA includes sections 1631 through 1646.  The displacement of federal law is not absolute, however, and it is well established that borrowers retain at least the ability to file suits in federal court pursuant to 15 U.S.C. § 1640.  *Belini v. Washington Mut. Bank, FA*, 412 F.3d 17, 20 (1st Cir. 2005).

[87] *In re Fidler*, 226 B.R. at 736; *Mayo v. Key Fin. Serv., Inc.*, 424 Mass. 862, 864 (1997). *See also* 209 C.M.R. § 32.27 (compliance with the Federal Reserve Board's Official Staff Commentary, which does not conflict with Mass. Gen. Laws ch. 140D or 209 C.M.R. 32.00 or an advisory opinion of the Commissioner, shall be deemed in compliance with the CCCDA); 209 C.M.R. § 32.28 (incorporating appendices D, E, F, G, H, and J of Regulation Z by reference).

[88] *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1120 (9th Cir. 2009); *see also Rendler v. Corus Bank*, 272 F.3d 992, 996 (7th Cir. 2001).

avoid . . . [informational overload]."[89]  Moreover, the United States Court of Appeals for the First

Circuit has rejected a rule of hyper-technicality with respect to TILA violations in favor of an

objective standard of clear and conspicuous disclosure.[90]  In adopting this standard, the First Circuit

reasoned that by amending TILA in 1995 to provide higher tolerance levels for "honest mistakes in

carrying out disclosure obligations . . . Congress made manifest that although it had designed the

TILA to protect consumers, it had not intended that lenders would be made to face overwhelming

liability for relatively minor violations."[91]

    B.  <u>The Motion to Dismiss</u>

       1.  The Fed. R. Civ. P. 12(b)(6) Standard

In *Ashcroft v. Iqbal*, the Supreme Court of the United States explained the standard for

dismissal under Fed. R. Civ. P. 12(b)(6), made applicable in adversary proceedings by Fed. R. Bankr.

P. 7012(b):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter,
> accepted as true, to "state a claim to relief that is plausible on its face." . . . A claim
> has facial plausibility when the plaintiff pleads factual content that allows the court
> to draw the reasonable inference that the defendant is liable for the misconduct
> alleged. . . . The plausibility standard is not akin to a "probability requirement," but
> it asks for more than a sheer possibility that a defendant has acted unlawfully. . . .
> Where a complaint pleads facts that are "merely consistent with" a defendant's
> liability, it "stops short of the line between possibility and plausibility of 'entitlement
> to relief.'" . . .
>
> Two working principles underlie our decision in *Twombly*. First, the tenet that a court
> must accept as true all of the allegations contained in a complaint is inapplicable to

---

[89] *Ford Motor Credit Co. v. Milhollin*, 444 U.S. at 568.

[90] *See Santos-Rodriguez v. Doral Mortgage Corp.*, 485 F.3d 12, 17 n.6 (1st Cir. 2007);
*McKenna v. First Horizon Home Loan*, 475 F.3d 418, 424 (1st Cir. 2007).

[91] *McKenna v. First Horizon Home Loan*, 475 F.3d at 424.

legal conclusions. . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.[92]

To reiterate, "[a]lthough for the purposes of a motion to dismiss [I] must take all of the factual allegations in the complaint as true, [I] 'a[m] not bound to accept as true a legal conclusion couched as a factual allegation.'"[93] Indeed, the First Circuit has explained that I need not "swallow the plaintiff's invective hook, line, and sinker; [and that] bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited."[94]

## 2. The Numerical Accuracy of the APR Disclosed

As I previously explained in the Decision:

The APR is defined as "a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made." The regulations provide that the APR "shall be determined in accordance with either the actuarial method or the United States Rule method" and further state that "[e]xplanations, equations, and instructions for determining the annual percentage rate in accordance with the actuarial method are set forth in appendix J to Regulation Z." Generally, appendix J states that the APR "shall be the nominal annual percentage rate determined by multiplying the unit-period rate by the number of unit-periods in a year." Beyond that, appendix J provides no meaningful guidance on how one might factor in an assumption like the one now before me.[95]

Nonetheless, the Debtor contends that the answer lies in the Commentary, which states in relevant part:

When creditors use an initial interest rate that is not calculated using the index or

---

[92] *Ashcroft v. Iqbal*, – U.S. –, 129 S.Ct. 1937, 1949-1950, 173 L.Ed.2d 868 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-570 (2007)) (citations omitted).

[93] *Id.* (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555).

[94] *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996).

[95] *In re DiVittorio*, 2009 WL 2246138 *9 (citations omitted).

23

formula for later rate adjustments, the disclosures should reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, *for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation. . . .*[96]

Having now considered the substance of this Commentary, I find that it is too vague to provide any meaningful assistance with the issue now before me. Although I did not rely on this passage in the Decision, I implicitly accepted its basic premise that the operative date for the APR calculation is the time of consummation.[97] With that in mind, the Commentary is silent as to the question posed here: namely, whether a lender, at the time of consummation, can factor an assumption of timely payments into the APR calculation?

The parties each rely on different considerations to fill in the gap left by the Commentary. Generally, the CCCDA requires disclosures to "reflect the terms of the legal obligation between the parties" and, in the absence of exact information, be "based on the best information reasonably available at the time the disclosure is provided."[98] The Defendant asserts that the terms of the Note and Mortgage required timely payments, while the Debtor argues that an assumption of timely payments was contrary to the best information available. In the Decision, I accepted the Defendant's argument, finding that an assumption of timely payments is reasonable because "[t]hat is no more than what the borrower agrees to do when he signs the note and mortgage."[99] The Debtor, however, asserts that this was error for several reasons.

---

[96] 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. 226.17(c)(1)(10)(i) (emphasis added).

[97] Moreover, the Debtor does not dispute that the Defendant employed a composite rate.

[98] 209 C.M.R. § 32.17(3)(a), (b).

[99] *In re DiVittorio*, 2009 WL 2246138 *10.

24

First, the Debtor contends that I was required to accept as true his allegation as set forth in the Complaint that the lender "knew or should have known that such an assumption [of timely payments] was not justified."[100]  I disagree.  As discussed above, I am not bound to accept legal conclusions couched in fact.[101]  While what the Defendant "knew or should have known" might otherwise be a factual allegation, whether something is "justified" is fundamentally a legal determination.  Moreover, the vagaries associated with the Debtor's position are evident from the Complaint, which goes on to provide that "[u]pon information and belief, statistical data within the lender's possession demonstrated [that the assumption of timely payments was not justified]," but provides no additional elaboration.[102]  Although the Debtor alleged the existence of statistical data within the Defendant's possession, the content and sufficiency of that data is described only as a legal conclusion in the Complaint.  While I must accept as true that the Defendant possessed "statistical data," I have been given no facts on which to base a legal conclusion that the data was insufficient to justify an assumption of timely payments.

Even assuming, *arguendo*, that the Defendant had in its possession statistical data showing that sub-prime borrowers were likely to be delinquent in their mortgage payments, it would be irrelevant in this context.  First and foremost, all disclosures are premised on what the parties obligate themselves to do.[103]  This is what the regulation requires and the reason is obvious- to

---

[100] Complaint, Docket No. 1 at ¶ 20.

[101] *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555.

[102] Complaint, Docket No. 1 at ¶ 20.

[103] 209 C.M.R. § 32.17(3)(a) ("The disclosures shall reflect the terms of the legal obligation between the parties.")

25

assume otherwise would render every disclosure an estimate and preclude any meaningful disclosure. For this reason, I question whether a borrower's strict compliance with the terms of his legal obligation can ever be deemed "unknown" for the purposes of this regulation.[104]  Therefore, because the lender had the exact information, resort to the "best information reasonably available," whatever that may have been, was unnecessary.

While the Debtor attempts to distance himself from this obligation by acknowledging only its "technical" accuracy and emphasizing the contingent nature of the Defendant's obligation to adjust the interest rate based upon the Reduction Feature, these characterizations miss the mark.  The Debtor was obligated to make timely payments and, upon making twenty-two timely payments, the Defendant was obligated to adjust the interest rate based upon a reduced margin to determine the interest rate for the remaining term of the loan.  Indeed, if at the time of consummation one assumes the borrower will strictly comply with his obligations, which I find the regulation requires, then logically the lender must similarly factor in any obligation based on that strict compliance.

As previously stated, the CCCDA is a disclosure statute and does not "substantively regulate consumer credit."[105]  In this way, the Debtor's attack on the design of the product itself belies its true nature as a backdoor attempt to revive a time-barred predatory lending claim.[106]  Indeed, the central

---

[104] *See* 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. 226.17(c)(2)(i)(1) ("Information is unknown if it is not reasonably available to the creditor at the time the disclosures are made.")

[105] *See Hauk v. JP Morgan Chase Bank USA*, 552 F.3d at 1120; *Rendler v. Corus Bank*, 272 F.3d at 996.

[106] *See, e.g., Commonwealth v. Fremont Investment & Loan*, 452 Mass. 733, 897 N.E.2d 548 (2008) (affirming injunction that restricted lender from foreclosing certain sub-prime loans where lender should have known that loans with four identified characteristics were "doomed to foreclosure" and thus unfair under Mass. Gen. Laws ch. 93A, § 2).

premise of the Debtor's Complaint, that the assumption of timely payments was not justified, sounds in negligence and speaks to the lender's business practices. Although dressed up in terms of numerical inaccuracy, the Debtor's argument is that the Defendant, by use of a complex adjustable interest rate feature premised on the Debtor's obligation to make timely payments, was able to disclose a better APR than he would likely receive. That simply is not a CCCDA claim because the disclosure was based upon what the regulations required.

Admittedly, Congress intended the APR to provide a simple means for consumers to compare loan products.[107] Nonetheless, regardless of how one calculates the APR for this loan, either using the Reduction Feature or not, I note that the figure disclosed would have been identical to some other loan product's APR that was not subject to any conditional feature.[108] As neither TILA nor the CCCDA substantively regulate credit terms, I cannot say the present calculation violates either statute absent a clearer directive from either Congress or the Federal Reserve Board. Even if regulators are unable to keep pace with the ingenuity of lenders, it is not the Court's role to read new

---

[107] *See, e.g., Buford v. American Fin. Co.*, 333 F.Supp. 1243, 1245 (N.D. Ga. 1971) ("In order to accomplish this purpose the Act creates two artificial terms-'finance charge' and 'annual percentage rate'-the determination of which is removed from the individual creditors and, instead, established by statute and regulation. The idea is to put a simple price tag on credit so that the consumer may 'comparison shop' in credit transactions by looking at the 'annual percentage rate.' H.R. Rep. No. 1040, 90th Cong., 2d Sess. (1968).").

[108] To illustrate, imagine three loan products: A, B, and C. Products A and B are variable rate loans with composite APRs of 8% and 16%, respectively. Neither is subject to any conditional interest rate feature such as the one in this case. Product C, however, is a variable rate loan with an incentive feature that provides the borrower with a composite APR of 8% if the borrower makes the first twenty-two payments timely and a composite APR of 16% if he does not. Without question, Product C is materially different from Products A and B. Nonetheless, no matter how one assumes Product C should be calculated, the APR disclosed will be identical to either Product A or B.

27

requirements and prohibitions into the statute.[109]  This further supports my conclusion that the Debtor
has attempted to re-characterize a time-barred predatory lending claim as a rescission claim under
the CCCDA.

Therefore, after reconsideration in light of the District Court's ruling, I again conclude that
the Debtor has not stated a claim under the CCCDA for which relief can be granted.

C.  The Motion for Summary Judgment

In the interests of judicial economy, I will consider the Motion for Summary Judgment as an
alternate basis for relief.  In so doing, I will assume, contrary to my findings above and in the
Decision, that the Debtor has stated a claim under the CCCDA.  Before delving into the merits,
however, I must separately address Joseph DiVittorio's purported exercise of his right to rescind as
a co-owner of the Property.

Without question, neither judicial estoppel nor the Release would bar Joseph DiVittorio from
exercising his right to rescind because, as far as I am aware, he has not taken a contrary position
before any other court and did not sign the Modification.  This is undoubtedly why he attempted to
rescind after the Motion for Summary Judgment was filed.  Nonetheless, Joseph DiVittorio is not
a plaintiff in this adversary proceeding or in any other action against the Defendant.  As such, I need
not consider the effect, if any, of his separate claim of rescission.[110]

_____

[109] To be clear, I do not mean to suggest that I accept the "mischievous" connotation the
Debtor has attached to the word "creative."  Instead, I merely note that the absence of express
guidance on this point suggests that products such as these likely were not contemplated by
lawmakers.

[110] I note, however, that assuming his exercise was premised on the same allegations
contained in the Debtor's Complaint, I would find that Joseph DiVittorio had not stated a claim
for rescission under the CCCDA.

1.  The Summary Judgment Standard

Pursuant to Fed. R. Civ. P. 56, summary judgment "shall be rendered if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as

to any material fact and that the movant is entitled to judgment as a matter of law."[111]  "A 'genuine'

issue is one supported by such evidence that 'a reasonable jury, drawing favorable inferences,' could

resolve it in favor of the nonmoving party."[112]  Material facts are those having the potential to affect

the outcome of the suit under the applicable law.[113]

The party seeking summary judgment "always bears the initial responsibility . . . of

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions

on filed, together with the affidavits, if any,' which demonstrate the absence of a genuine issue of

material fact."[114]  The nonmoving party must then "produce 'specific facts, in suitable evidentiary

form, to . . . establish the presence of a trialworthy issue.'"[115]  A trialworthy issue cannot be

established by "conclusory allegations, improbable inferences, and unsupported speculation."[116]  The

---

[111]  Fed. R. Civ. P. 56(c) made applicable in adversary proceedings by Fed. R. Bankr. P. 7056.

[112]  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d. 1, 2 (1st Cir. 1999)(*quoting Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 427 (1st Cir. 1996)).

[113]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 314-315 (1st Cir. 1995); *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993).

[114]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

[115]  *Triangle Trading Co.*, 200 F.3d at 2 (*quoting Morris v. Gov't Dev't Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)).

[116]  *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990)(*quoting Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.[117] Nonetheless, the absence of a material factual dispute is merely a "condition necessary," but not a "condition sufficient" to summary judgment.[118] The moving party must still demonstrate an entitlement to judgment as a matter of law.[119]

### 2. Judicial Estoppel

The doctrine of judicial estoppel bars a party from asserting a position in one legal proceeding which is contrary to a prior position successfully asserted in another.[120] Recognizing that it is discretionary doctrine based in equity, the Supreme Court of the United States stated the following:

> Courts have observed that "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," . . . . Nevertheless, several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. . . . . Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled," . . . . Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," . . . and thus poses little threat to judicial integrity. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. . . .
>
> In enumerating these factors, we do not establish inflexible prerequisites or an

---

[117] *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir. 2000).

[118] *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir.1994).

[119] *Id.*

[120] *Fleet Nat'l Bank v. Gray (In re Bankvest Corp.)*, 375 F.3d 51, 61 (1st Cir. 2004) ("The doctrine of judicial estoppel takes effect when the proponent has shown that the party to be estopped 'succeeded previously with a position directly inconsistent with the one [it] currently espouses.' *Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 13 (1st Cir. 1999).").

exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts.[121]

In the First Circuit, judicial estoppel has been applied when a debtor fails to disclose a claim in bankruptcy proceeding and later seeks to assert it.[122] "In such a situation, the plan to '[c]onceal your claims; get rid of your creditors on the cheap, and start over with a bundle of rights' constitutes 'an unacceptable abuse of judicial proceedings.'"[123] Nevertheless, estoppel is not the automatic result of a failure to schedule an asset as courts have been reluctant to apply the equitable doctrine where the debtor's failure arose from inadvertence, such as a lack of knowledge of the undisclosed claim.[124]

In *GE HFS Holdings, Inc.*, Judge Gertner recognized that, "[w]hile the parameters of the doctrine of judicial estoppel are 'hazy,' and each case must be decided on its own facts, the First Circuit has decided that there are at least two conditions which must be satisfied before the doctrine may be applied."[125] First, the legal or factual position advanced in the earlier proceeding must be "directly inconsistent" with the position now asserted.[126] Second, the party must have succeeded in

---

[121] *New Hampshire v. Maine*, 532 U.S. 742, 749-751 (2001) (citations omitted).

[122] *See, e.g., In re Bankvest Capital Corp.*, 375 F.3d at 61; *Payless Wholesale Distribs., Inc. v. Alberto Culver, Inc.*, 989 F.2d at 571; *Sullivan v. Decision One Mortgage (In re Sullivan)*, 346 B.R. 4, 31-32 (Bankr. D. Mass. 2006); *Xytest Corp. v. Mitchell (In re Mitchell)*, 255 B.R. 97, 108 (Bankr. D. Mass. 2000).

[123] *GE HFS Holdings, Inc. v. Nat'l Union Fire Ins. Co. Of Pittsburgh, PA*, 520 F.Supp.2d at 223 (quoting *Payless Wholesale Distribs., Inc. v. Alberto Culver, Inc.*, 989 F.2d at 571).

[124] *Id.* at 224; *see also New Hampshire v. Maine*, 532 U.S. at 753 ("We do not question that it may be appropriate to resist application of judicial estoppel 'when a party's prior position was based on inadvertence or mistake.' *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995).").

[125] *Id.* at 223.

[126] *In re Bankvest Capital Corp.*, 375 F.3d at 61.

the prior proceeding, meaning that the court "accepted the legal or factual assertion alleged to be at odds with the position advanced in the current forum . . . ."[127]

Although the Defendant and Debtor argued at length regarding the Debtor's knowledge of his non-disclosure, I find that the Defendant has otherwise failed to satisfy one of the mandatory conditions identified by the First Circuit for application of judicial estoppel. Contrary to the Defendant's assertion, I never "accepted" a position advanced by the Debtor as to the existence or non-existence of any claim under the CCCDA. Without question, no such claim appeared on the Debtor's schedules, but unlike the cases which have applied the doctrine, I have not granted the Debtor any relief, such as a discharge, based upon representations made in them.[128] Indeed, the Debtor could still amend his schedules and Chapter 13 plan to reflect an omitted asset if necessary. For that reason, confirmation of the Debtor's plan would not amount to "acceptance of a position" in the same manner.

The Defendant's reliance on the stipulation and Modification are equally unavailing. Both are in the nature of a settlement, and the First Circuit has held that a court does not accept the legal or factual allegations of the underlying matter by approving a settlement, rendering judicial estoppel inappropriate.[129] I am also unimpressed by the Defendant's assertion that it relied upon the Debtor's tacit position that the Mortgage was valid and not subject to rescission in negotiating and executing

[127] *Gens v. Resolution Trust Corp. (In re Gens)*, 112 F.3d 569, 572-73 (1st Cir. 1997).

[128] *See, e.g., Jeffrey v. Desmond,* 70 F.3d 183 (1st Cir. 1995); *Payless Wholesale Distribs., Inc. v. Alberto Culver, Inc.*, 989 F.2d at 571; *Russo v. Russo (In re Russo)*, No. 07-1194, 2007 WL 4233118 (Bankr. D. Mass. Nov. 28, 2007); *In re Sullivan*, 346 B.R. at 32; *Petroski v. First Horizon Home Loans, Inc.*, 2004 WL 1551736 *3; *In re Mitchell*, 255 B.R. at 104; *Leary v. Miller (In re Leary)*, 241 B.R. 266 (Bankr. D. Mass. 1999).

[129] *In re Bankvest Capital Corp.*, 375 F.3d 61 (*citing Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1038 (2d Cir.1993), *Water Technologies Corp. v. Calco Ltd.*, 850 F.2d 660, 665-66 (Fed. Cir. 1988) and *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982)).

the Modification.  If the Defendant truly relied on the Debtor's representations, one wonders why the Modification nonetheless purports to contain a release of such claims.

Accordingly, based upon the principles set forth by the First Circuit, I find that application of judicial estoppel is not appropriate in this case.

### 3.  Waiver

As noted by the parties, there is little authority with respect to the validity of TILA claim waivers.  Nonetheless, they agree, at least in theory, that TILA claims are waivable under certain circumstances.  Not surprisingly, they part company on the issues of what those circumstances are whether they exist here.

Both TILA and the CCCDA provide that the Board or the Commissioner, respectively, may, if such action is found "necessary in order to permit homeowners to meet bona fide personal financial emergencies, prescribe regulations authorizing the modification or waiver of any rights created under this section to the extent and under the circumstances set forth in those regulations."[130] Accordingly, the regulations to both statutes provide that:

> The consumer may modify or waive the right to rescind if the consumer determines that the extension of credit is needed to meet a *bona fide* personal financial emergency. To modify or waive the right, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the right to rescind, and bears the signature of all the consumers entitled to rescind. Printed forms for this purpose are prohibited . . . .[131]

Regulation Z, unlike the Massachusetts analog, provides three additional subparagraphs describing situations where the consumer's need to obtain funds immediately due to natural disasters shall be

---

[130] 15 U.S.C. § 1635(d); Mass. Gen. Laws ch. 140D, § 10(d).

[131] 12 C.F.R. § 226.23(e)(1); 209 C.M.R. § 32.23(5).

regarded as a *bona fide* personal financial emergency.[132]  The Commentary generally reiterates the requirements set forth in the regulations and does not elaborate further.[133]

Both parties agree that the preceding regulation does not apply to what the Debtor describes as a "post-dispute" waiver, such as the settlement of a lawsuit.[134]  The Defendant contends that this regulation applies only to the initial three-day rescission period and not any extended period arising from the failure to provide material disclosures.[135]  In light of the text of the regulation, and particularly the additional paragraphs included in Regulation Z, I am persuaded that the Defendant is correct.  Based on the examples of a "*bona fide* personal financial emergenc[ies]" provided in Regulation Z, essentially situations where the consumer is unable to wait for the initial rescission period to expire before the loan is funded, I find it difficult to see how one could arise at a time other than consummation of the transaction.  This, however, does not entirely address the issue implicitly raised by the Debtor, namely, whether it is possible to waive the right of rescission after the expiration of the initial rescission period but before the underlying claim is raised.

Due to the dearth of case law available, a brief discussion of each is warranted.  *Buford v. American Fin. Co.* was decided by the United States District Court for the Northern District of Georgia in 1971.[136]  The facts involved a lender disclosing a notary fee of $1.00 as a separate item instead of including it in the calculation of finance charges and APR.  The plaintiff signed a release after the commencement of the case in which she received $10.00 in return for releasing the

---

[132] *See* 12 C.F.R. § 226.23(e)(2), (3), (4).

[133] *See* 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. 226.23(e)(1),(2).

[134] See, e.g., *Tucker v. Beneficial Mortgage Co.*, 437 F.Supp.2d at 589.

[135] *See* 15 U.S.C. § 1635(a); Mass. Gen. Laws ch. 140D, § 10(a).

[136] *Buford v. American Fin. Co.*, 333 F.Supp. at 1243.

defendants of all liability under TILA.  Relying on *Brooklyn Savs. Bank v. O'Neil*,[137] the court

analogized TILA to the Fair Labor Standards Act and concluded that "'[w]here a private rights [sic]

is granted in the public interest to effectuate a legislative policy, waiver . . . will not be allowed

where it would thwart the legislative policy it was designed to effectuate.'"[138] As such, the court held

the release obtained was void as contrary to public policy.[139]

In 1982, the United States Court of Appeals for the Eleventh Circuit rejected *Buford*'s rule

of absolute prohibition in *Parker v. DeKalb Chrysler Plymouth*.[140]  In that case, the plaintiff financed

the purchase of a vehicle from the defendant, who failed to make all the material disclosures required

under the statute.[141]  Five days later, the plaintiff returned to the defendant's dealership reporting

mechanical problems with the vehicle.[142]  For consideration of $500, the plaintiff signed a release

covering "any and all claims from the beginning of the world . . . including but not limited to any

claim I might have arising out of my purchase . . . ."[143]  Nonetheless, the plaintiff brought a TILA

claim shortly thereafter, asserting that when she signed the release she believed that it covered only

the mechanical difficulties she had been having with her car and was not informed of her rights

under TILA.[144]  Like *Buford*, the Eleventh Circuit considered the public policy concerns as discussed

---

[137] *Brooklyn Savs. Bank v. O'Neil*, 324 U.S. 697 (1945).

[138] *Buford v. American Fin. Co.*, 333 F.Supp. at 1248 (*quoting Brooklyn Savs. Bank v. O'Neil*, 324 U.S. at 704).

[139] *Id.* at 1249.

[140] *Parker v. Dekalb Chrysler Plymouth*, 673 F.2d at 1182.

[141] *Id.* at 1179.

[142] *Id.*

[143] *Id.*

[144] *Id.*

in the *Brooklyn Savs. Bank* case, but stated that "[w]e disagree with . . . the absolute rule of *Buford*

. . . which holds all attempted releases of TILA claims null and void."[145]   Instead, the Eleventh

Circuit held that under the circumstances of the case:

> *Parker's release does not bar her TILA claim because we are convinced that she was*
> *unaware that the release encompassed her TILA rights*. Parker's uncontroverted
> affidavit states that DeKalb never mentioned TILA when it gave her the release.
> Although DeKalb disputes the type of representations made to Parker concerning the
> repair of her Cordoba, it does not deny the absence of any disclosures about TILA.
> *More importantly, the release itself does not contain any reference to prospective*
> *TILA claims*, and the policies underlying TILA, as we have explained, do not permit
> us to read her TILA rights into the boiler plate language of "any and all claims."
> While a consumer may have good reason to believe that "all claims" in the release
> applies to mechanical problems afflicting a new car, they may be unfairly deceived
> if we allow such broad language to bar their claims under an Act of which they may
> be unaware and which was passed for the protection of all borrowers, both gullible
> and sophisticated.[146]

Eleven years later, the validity of a TILA waiver was addressed by the United States District

Court for the Northern District of Illinois in *Johnson v. Steven Sims Subaru, Inc.*[147]   The defendant

in that case, another auto dealership, used standard lease forms which violated TILA.[148]   The plaintiff

raised the TILA violations prior to filing suit, at which time the defendant mailed her a check, which

she cashed, containing the following language on its back: "Accepted by payee as payment in full

of any and all monies due payee from drawer of any nature whatsoever."[149]   Noting that "TILA

requires 'strict technical compliance, regardless of actual injury' and its statutory mandate of

disclosure of material terms is intended to benefit all consumers, not just the individual claimant,'

---

[145] *Id.* at 1181-1182.

[146] *Id.* at 1182 (citation omitted) (emphasis added).

[147] *Johnson v. Steven Sims Subaru, Inc*, 1993 WL 761231 *4.

[148] *Id.* at *1.

[149] *Id.* at *4-5.

the court held that "the failure of the alleged release to specifically waive [the plaintiff's] TILA claims violates the spirit of explicit disclosure that permeates TILA."[150]

A year and a half later, the United States District Court for the District of Columbia decided *Mills v. Home Equity Group, Inc.*[151] Factually, this case is the most similar to the one at bar. The plaintiff entered into a loan agreement with the lender, and within two years had defaulted and executed a loan modification with the assistance of *pro bono* counsel.[152] The loan modification contained a release which expressly referenced claims arising out of the loan documents including those under Regulation Z.[153] Shortly thereafter, the plaintiff defaulted again, but this time sought to rescind the transaction based upon the non-disclosure of finance charges, the schedule of payments, and the total of the payments to be made.[154] Like *Johnson*, the *Mills* court noted that TILA "must be complied with meticulously," but found that the waiver provisions of 12 C.F.R. 226.23(e)(1) were not satisfied.[155] The court cited *Parker* and *Brooklyn Savs. Bank*, but ultimately held:

> Plaintiff properly exercised her right to rescind within three years of the consummation of the loan transaction. This right was not waived by the settlement entered into with Defendant. Plaintiff was not told she had the unequivocal right to rescind. Indeed, the new loan amount included the unpaid principal and interest. For there to be any basis to argue that Plaintiff waived her statutorily conferred rights, she would have had to at the least been given the right to rescind and declined to assert it.
>
> At no time did Defendant Bennett offer her such a right. Rather at all times,

---

[150] *Id.* at *5 (*quoting Parker v. Dekalb Chrysler Plymouth*, 673 F.2d at 1181).

[151] *Mills v. Home Equity Group, Inc*, 871 F.Supp. at 1482.

[152] *Id.* at 1484.

[153] *Id.*

[154] *Id.*

[155] *Id.* at 1486.

Defendant Bennett denied that Plaintiff had a valid claim under the Act.[156]

Curiously, the court focused on the defendant's non-disclosure of the right to rescind, but the facts

do not reveal that it was one of the material disclosures whose absence gave rise to the right.

The final and most recent case, *Tucker v. Beneficial Mortgage Co.*, is also the most factually

distinct. In this case, the United States District Court for the Eastern District of Virginia held that

the plaintiffs had previously waived their right to rescission by joining a class-action settlement

negotiated by the state's Attorney General.[157] Noting the factual distinctions separating this release

from the ones in *Parker*, *Mills*, and *Buford*, the court found that a settlement effectuated by the

Attorney General on behalf of private consumers did not undermine the legislative intent of TILA.[158]

Moreover, the court recognized that invalidating a waiver under such circumstances would

undermine the ability of both State Attorneys General and private consumers to negotiate future

TILA settlements.[159]

The Debtor attempts to reconcile these cases by distinguishing "pre-dispute" waivers from

"post-dispute" waivers. Having reviewed these cases carefully, however, I find that these labels are

too simplistic and ignore the subtleties of each decision. Moreover, I disagree with both the *Johnson*

and *Mills* cases as they clearly applied a hyper-technical standard which has been rejected by the

First Circuit.[160] Under a clear and conspicuous disclosure standard, the *Johnson* case is particularly

---

[156] *Id.*

[157] *Tucker v. Beneficial Mortgage Co.*, 437 F.Supp.2d at 586.

[158] *Id.* at 588.

[159] *Id.* at 589.

[160] *See Johnson v. Steven Sims Subaru, Inc*, 1993 WL 761231 *5; *Mills v. Home Equity Group, Inc*, 871 F.Supp. at 1486. I also disagree with the *Buford* decision, but need not discuss it further as neither party suggests that there is an absolute prohibition against TILA waivers.

troubling because the plaintiff expressly raised her TILA claims before cashing the check.  As there can be no argument that she did not realize what she was waiving, the only justification for holding the release invalid is the technical absence of a reference to TILA.  Going even further, the *Mills* case appears to suggest that an express reference to Regulation Z is insufficient unless prior to executing the release the lender offers the plaintiff an opportunity to rescind, even where the right to rescind was initially disclosed at the time of consummation.  Additionally, contrary to *Mills*, I have already concluded that the 12 C.F.R. § 226.23(e)(1), as well as the Massachusetts analog, does not apply to the extended right of rescission.

Debtor's characterizations are also based on too broad a reading of *Parker*.  Notably, the Eleventh Circuit expressly limited its holding to the circumstances of that case.[161]  Although the Eleventh Circuit stated that the policies underlying TILA would not permit a waiver with general boiler plate "any and all claims" language, it did not hold that prospective TILA waivers were against public policy.  Instead, the Eleventh Circuit held that under the circumstances of that case, such broad language is unfairly deceptive.  Considering that the waiver in question arose in the context of a vehicle repair only days after the purchase, contained only general "any and all claims" language, and was signed without the assistance of counsel, the Eleventh Circuits' concern was likely whether or not this could have been knowing and voluntary release.

Neither the federal courts within the First Circuit nor the Massachusetts state courts have addressed the validity of a TILA/CCCDA waiver.  Regardless of the context, courts unanimously

---

[161] *Parker v. Dekalb Chrysler Plymouth*, 673 F.2d at 1182 ("We simply find that a release *given under the circumstances in this case* does not bar a claim under the Truth in Lending Act.") (emphasis added).

define waiver as the intentional relinquishment of a known right.[162]   Although the specific rights in

question often raise unique considerations for the reviewing court, judicial review of a waiver or

release, at a minimum, requires that they are "knowing and voluntary."[163]   "The inquiry into waiver

consists of two questions: whether a party actually knew []he was relinquishing a benefit, and

whether []he acted voluntarily in doing so."[164]   To answer these questions, the First Circuit has

endorsed a "totality of the circumstances" approach to determining the validity of waivers.[165]

In the present case, the Debtor argues that his waiver was not "knowing" because he was

unaware that he had a CCCDA claim due to the Defendant's concealment of the "true" APR.

---

[162] *See, e.g., United. States v. Olano*, 507 U.S. 725, 733 (1993); *United States v. Morgan*, 384 F.3d 1, 7 (1st Cir. 2004); *Irons v. FBI*, 811 F.2d 681, 686 (1st Cir. 1987) *withdrawn on reh'g on other grounds*, 880 F.2d 1446 (1st Cir. 1989);  *Alan Corp. v. Int'l Surplus Lines Ins. Co.*, 823 F.Supp. 33, 42 (D. Mass. 1993); *Micro Control Sys., Inc. v. Cadkey Corp. (In re Cadkey Corp.)*, 324 B.R. 424, 428 (D. Mass. 2005); *Moss v. Old Colony Trust Co.*, 246 Mass. 139, 150, 140 N.E. 803 (1923); *St. John Bros. v. Falkson*, 237 Mass. 399, 402, 130 N.E. 51 (1921); *Normandin v. Eastland Partners, Inc.*, 68 Mass.App.Ct. 377, 413, 862 N.E.2d 402 (2007).

[163] *See, e.g., Melanson v. Browning-Ferris Indus., Inc.*, 281 F.3d 272, 276 (1st Cir. 2002) (applying six-factor "knowing and voluntary" test to waiver of sexual discrimination claims under Title VII); *Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9, 12 (1st Cir. 1997) (applying a totality of the circumstances approach to determining the validity of waivers to case brought under the American with Disabilities Act); *Rowe v. Town of North Reading*, No. 984216, 2001 WL 170655, at *7 (Mass. Super. Jan. 5, 2001) (applying "knowing and voluntary" standard to handicap and age discrimination claims under Massachusetts law).

[164] *Smart v. Gillete Co. Long-Term Disability Plan*, 70 F.3d 173, 182 (1st Cir. 1995).  The First Circuit has frequently cited the following six factors as relevant and helpful to the totality of the circumstances inquiry: (1) the plaintiff's education, business experience, and sophistication; (2) the parties' respective roles in deciding the final terms of the arrangement; (3) the agreement's clarity; (4) the amount of time available to the plaintiff to study the agreement before acting on it; (5) whether the plaintiff had independent advice-such as the advice of counsel-when she signed the agreement; and (6) the nature of the consideration tendered in exchange for the waiver. *Id.* (*citing Finz v. Schlesinger*, 957 F.2d 78, 81 (2d Cir. 1992), *cert. denied*, 506 U.S. 822 (1992)).

[165] *Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d at 12; *Smart v. Gillete Co. Long-Term Disability Plan*, 70 F.3d at 181.

Notably, the First Circuit rejected a similar argument in the context of a statute of limitations defense.[166]  In *Salois v. The Dime Savs. Bank of New York*, the plaintiffs asserted that their TILA claims were timely due to equitable tolling under both state and federal law in light of the defendant's "concealment" of the negative amortization structure of their loan.[167]  The First Circuit, citing Massachusetts law, disagreed, concluding that the plaintiffs had been on inquiry notice because they had the loan documents and therefore all the information necessary to discover their claims.[168]  Moreover, the First Circuit rejected the plaintiffs' assertion that the claim was not discovered until they consulted with an attorney, noting the absence of newly discovered information.[169]  Although not expressly addressed, the First Circuit also dismissed the plaintiffs' argument that the complexity of the math involved rendered the claim "concealed."[170]

Based upon the principles set forth in the *Salois* case, I find that as a matter of Massachusetts law, the Debtor's possession of the loan documents put him on inquiry notice of his purported CCCDA claims and his right to rescind.  Moreover, by specifically referencing claims arising "in connection with the making, closing, administration, collection, or the enforcement . . . of the loan documents," the Release should have compelled him to investigate the possibility of such claims.

---

[166] *Salois v. The Dime Savings Bank of New York, FSB*, 128 F.3d at 25.

[167] *Id.* at 24.

[168] *Id.* at 26; *see Hull v. Attleboro Savings Bank*, 33 Mass.App.Ct. 18, 24, 596 N.E.2d 358 (1992) (under Massachusetts law, "one who signs a writing that is designed to serve as a legal document . . . is presumed to know its contents."); *see also Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 226 (1st Cir. 2004); *Lerra v. Monsanto Co.*, 521 F.Supp. 1257, 1262 (D.Mass.1981); *Connecticut Jr. Republic v. Doherty*, 20 Mass.App.Ct. 107, 110, 478 N.E.2d 735 (1985).

[169] *Salois v. The Dime Savings Bank of New York, FSB*, 128 F.3d at 26.

[170] *See Id.* at 23.

41

It is also significant that the Debtor executed this Release as part of the Modification after eight months of negotiations with the Defendant, during which he was represented by counsel.[171]  As a necessary part of that representation, prior counsel would have reviewed the loan documents, analyzed any possible claims arising therefrom, negotiated the terms of the Modification, explained them to the Debtor, and made a recommendation with respect to a course of action.[172]  Consequently, I find the Debtor's execution of the Release contained within the Modification was knowing and voluntary.

Having satisfied the minimum requirements of a valid release, I must consider what other requirements might exist in the TILA/CCCDA context.  Although the Eleventh Circuit in *Parker* ultimately disagreed with *Buford*'s absolute prohibition rule, it was persuaded by the idea that "'[w]here a private rights [sic] is granted in the public interest to effectuate a legislative policy, waiver . . . will not be allowed where it would thwart the legislative policy it was designed to effectuate.'"[173]  In this context, the Eleventh Circuit was convinced that general "any and all claims" language would thwart the public interest in deterring inconsistent and indecipherable lending practices as embodied by TILA.  I concur and conclude that as disclosure statutes, TILA and the

---

[171] I further note that the Release was undoubtedly part of the consideration required by the Defendant to enter into the Modification.

[172] I further note that the Debtor has not offered any compelling or coherent reason why only successor counsel could discover his purported CCCDA claims.  Regardless, "[t]here are few tenets so well established in American jurisprudence as the proposition that a client is bound by the mistakes of its chosen counsel."  *Chestnut v. City of Lowell*, 305 F.3d 18, 26 (1st Cir. 2002); *see, e.g., Irwin v. Dept. of 93 Veterans Affairs*, 498 U.S. 89, 92 (1990) (explaining that in "our system of representative litigation . . . each party is deemed bound by the acts of his lawyer-agent"); *Hoult v. Hoult*, 57 F.3d 1, 5 (1st Cir. 1995) ("We have repeatedly held that the acts and omissions of counsel are customarily visited upon the client in a civil case." (internal quotation marks omitted)).

[173] *Buford v. American Fin. Co.*, 333 F.Supp. at 1248 (*quoting Brooklyn Savs. Bank v. O'Neil*, 324 U.S. at 704).

CCCDA require any waiver of such claims to be clearly and conspicuously disclosed.

In the First Circuit, clear and conspicuous disclosure is measured objectively, meaning "courts must evaluate the adequacy of TILA disclosures from the vantage point of a hypothetical average consumer-a consumer who is neither particularly sophisticated nor particularly dense."[174] In this light, I find that the Release satisfies this burden as it expressly references claims arising "in connection with . . . the loan documents." While the average consumer may not fully appreciate the full breadth of this language without the assistance of counsel, which I note the Debtor had, he would certainly understand that a claim arising from the adequacy of the disclosures in the loan documents would be included. The absence of the words "TILA," "CCCDA," and "Regulation Z" are irrelevant as the Release conveys the same message without such technical references.

Finally, I note that the Release is much more specific than the one in *Parker*, and arises in a substantially different context. Unlike *Parker*, where the release contained no reference to the loan documents and was signed in connection with vehicle repairs, the Release specifically identifies claims arising in connection with the loan documents and was signed following lengthy negotiations with the Defendant regarding a Modification. Moreover, this Debtor, unlike any of the plaintiffs in the cases discussed above, received the full benefit of the extended rescission periods under both TILA and the CCCDA before signing the Release. Although the Massachusetts legislature preserved a recoupment defense in the statute, a release signed at this stage does not give rise to the same concerns regarding lenders inappropriately trying to draft around their disclosure requirements.[175]

The Debtor also argues that the Release is unenforceable under the Massachusetts Statute of

---

[174] *Palmer v. Champion Mortgage*, 465 F.3d 24, 28 (1st Cir. 2006).

[175] *See* Mass. Gen. Laws ch. 140D, § 10(i)(3).

Frauds because the Defendant did not sign the copy submitted to the Court.[176]  The statute provides, in relevant part:

> No action shall be brought:
>
> * * *
>
> Fourth, Upon a contract for the sale of lands, tenements or hereditaments or of any interest in or concerning them. . .
>
> * * *
>
> Unless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and *signed by the party to be charged* therewith or by some person thereunto by him lawfully authorized.[177]

Apparently, the Debtor erroneously believes that the Defendant is the party to be charged with the Modification.  It is well-established that an agreement need only be signed by the party against whom it is to be enforced to satisfy the Statute of Frauds.[178]  Accordingly, it is irrelevant that the Defendant did not sign or just did not produce the signed copy of the Modification because the Debtor did and the Defendant seeks to enforce it against him.

I am also unpersuaded by the Debtor's argument that the language of the Release is ambiguous because the Defendant is by definition both "Ocwen" and the "investor" in that paragraph.  Although use of the conjunctive in the Release is ultimately redundant, it is not misleading and does not give rise to multiple definitions of Ocwen as the Debtor suggests.

In sum, I find that the Release is valid and that the Debtor has waived his claims under the CCCDA.

---

[176] Mass. Gen. Laws ch 259, § 1.

[177] *Id.*

[178] *See Old Colony R. Corp. v. Evans*, 72 Mass. 25 (1856); *Slater v. Smith*, 117 Mass. 96 (1875); *Dresel v. Jordan*, 104 Mass. 407 (1870).

## V. <u>CONCLUSION</u>

In light of the foregoing, I will enter an order reaffirming my order granting the Motion to

Dismiss and, alternatively, granting the Motion for Summary Judgment.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: May 28, 2010